MORITZ, J., dissenting.
During the rebuttal portion of her closing argument, the prosecutor told Grant's jury, "[T]he law says ... that before something can be mitigating it must reduce the moral culpability or blame of the defendant." R. Vol. 4, Trial Tr. 8, at 75 (emphasis added). And to ensure that no reasonable juror would have cause to doubt her, the prosecutor reinforced that this wasn't just what she was saying or what the court was saying, but what "the law sa[id]." Id. (emphasis added). I would find that no reasonable juror would have doubted her. Nor would a reasonable juror have doubted the prosecutor on the three other separate occasions when she told the jurors that the law prohibited them from considering evidence as mitigating unless it reduced Grant's culpability or blame.
The majority doesn't dispute that the prosecutor misstated the law on mitigating evidence. Nor does it dispute that she did so repeatedly. Instead the majority questions whether the jury believed those repeated misstatements. Yet I see no reason to think it wouldn't have. The prosecutor's numerous misstatements found explicit support in the jury instructions.[1] Further, the trial court implicitly endorsed the prosecutor's misstatements by overruling the defense's objection to them. It's therefore clear that the jury felt legally precluded from considering all of Grant's mitigation evidence. Grant's death sentence therefore violates the Eighth and Fourteenth amendments, and I would reverse the district court's order denying Grant's habeas petition.
Analysis
The majority all but concedes that the prosecutor's comments impermissibly narrowed the scope of evidence that the jury could treat as mitigating. But it nevertheless *961 affirms Grant's death sentence because it opines that the OCCA reasonably concluded that the prosecutor's improper comments didn't actually mislead the jury. In doing so, the majority errs in two respects. First, the majority overlooks the fact that the OCCA misunderstood Grant's argument on direct appeal and therefore didn't actually adjudicate this claim on the merits. Thus, AEDPA's deferential standard of review doesn't apply. See Chadwick v. Janecka , 312 F.3d 597, 606 (3d Cir. 2002) (explaining that "if an examination of the opinions of the state courts shows that they misunderstood the nature of a properly exhausted claim and thus failed to adjudicate that claim on the merits, the deferential standards of review in AEDPA do not apply"); 28 U.S.C. § 2254(d) (requiring us to defer to state-court decision only when state court resolved particular claim "on the merits"). Second, even if the OCCA had resolved this claim on the merits, it would have been unreasonable for the OCCA to conclude that there was no reasonable likelihood the prosecutor's comments misled at least one juror.
The majority "acknowledge[s] that a plausible argument could be made here that the prosecutor's rebuttal arguments were 'improper.' " Maj. Op. 938 (quoting Harris v. State , 164 P.3d 1103, 1114 (Okla. Crim. App. 2007) ). But because the majority doesn't "definitively opine on the matter," id. , it has no reason to discuss just how "improper" those statements actually were, id. (quoting Harris , 164 P.3d at 1114 ). I take a different approach. First, I explain how the prosecutor's misstatements undermined the Constitution's promise that the death penalty will not be imposed without the most circumspect deliberation. Then, with that conclusion in mind, I explain the two overarching deficiencies in the majority's analysis: its deference to the OCCA and its conclusion that the OCCA reasonably resolved this issue in the state's favor.
I. Flaws in Grant's Sentencing Proceeding
"[I]n capital cases the fundamental respect for humanity underlying the Eighth Amendment requires consideration of the character and record of the individual offender ... as a constitutionally indispensable part of the process of inflicting the penalty of death." Woodson v. North Carolina , 428 U.S. 280, 304, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) (plurality opinion) (citation omitted). Thus, a jury must "not be precluded from considering, as a mitigating factor , any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." Lockett v. Ohio , 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (plurality opinion) (footnote omitted); see also Eddings v. Oklahoma , 455 U.S. 104, 110, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) (adopting Lockett plurality's rule). Critically, this is true even if the evidence that "the defendant proffers," Lockett , 438 U.S. at 604, 98 S.Ct. 2954, doesn't provide a legal excuse for the defendant's crime, see Eddings , 455 U.S. at 112-14, 117, 102 S.Ct. 869 (reversing death sentence where sentencing judge stated that he was legally precluded from considering defendant's violent background; explaining that although sentencer "may determine the weight to be given relevant mitigating evidence," it "may not give it no weight by excluding such evidence from [its] consideration" (emphasis added)).
Clearly established Supreme Court precedent therefore requires that Grant's jury felt free to at least consider all the mitigating evidence that Grant presented. Of course the jury could have properly decided to give that evidence little weight.
*962 See Eddings , 455 U.S. at 114-15, 102 S.Ct. 869. But Grant's death sentence cannot stand if there's a "reasonable likelihood that the jury would have found itself foreclosed from [even] considering" his mitigating evidence. Johnson v. Texas , 509 U.S. 350, 367-68, 113 S.Ct. 2658, 125 L.Ed.2d 290 (1993). And although this standard requires more than the mere "possibility of such an inhibition," it doesn't require Grant to show "that the jury was more likely than not to have been impermissibly inhibited" from considering all of Grant's mitigating evidence. Boyde v. California , 494 U.S. 370, 380, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990).
Finally, in determining whether the jury felt free to consider all of Grant's mitigating evidence, we review the totality of the jury instructions and closing arguments. See id. at 383-86, 110 S.Ct. 1190 (considering challenged instruction in context of closing arguments and other jury instructions); Penry v. Lynaugh (Penry I) , 492 U.S. 302, 325-26, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) (considering challenged instruction in context of closing arguments), abrogated on other grounds by Atkins v. Virginia , 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) ; Hanson v. Sherrod , 797 F.3d 810, 852 (10th Cir. 2015) (considering challenged instruction in context of other instructions and closing arguments).
A. Instruction 12
Like the majority, I start with the instruction that defined mitigating circumstances for the jury. Instruction 12 stated, in relevant part, "Mitigating circumstances are those which, in fairness, sympathy, and mercy, may extenuate or reduce the degree of moral culpability or blame. The determination of what circumstances are mitigating is for you to resolve under the facts and circumstances of this case." O.R. 2349.
Instruction 12 is ambiguous at best. The word "may" might arguably broaden the instruction. Id. But at least some jurors very likely read Instruction 12 to prevent the jury from "consider[ing], as a matter of law ," Eddings , 455 U.S. at 114, 102 S.Ct. 869, "aspects of [Grant's] character and record" that didn't reduce his moral culpability or blame, Lockett , 438 U.S. at 605, 98 S.Ct. 2954. This definition of mitigating circumstances was impermissibly narrow. See Lockett , 438 U.S. at 604, 98 S.Ct. 2954 (holding that jury must be free to consider "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death" (emphasis added)).
Indeed, even the OCCA has recognized that Instruction 12 can be problematic when the prosecution takes certain liberties in its closing arguments. See Harris v. State , 164 P.3d 1103, 1113-14 (Okla. Crim. App. 2007). In fact, after Grant's 2005 trial, the OCCA recommended that the Oklahoma Uniform Jury Instruction Committee amend Instruction 12 because prosecutors had been using the instruction to "egregious[ly] misstate[ ] ... the law on mitigating evidence" by "argu[ing] that evidence of a defendant's history, characteristics or propensities should not be considered as mitigating simply because it does not go to his moral culpability or extenuate his guilt." Id. at 1113-14. But the OCCA refrained from declaring that Instruction 12 was unconstitutional in the absence of such improper arguments.[2] See id. at 1113.
*963 B. The Prosecution's Improper Assertions
Our starting point is thus an instruction that-at minimum-flirts with the impermissible. But as Penry I , Boyde , and Hanson instruct us, we must consider the totality of the jury instructions and closing arguments. Doing so here only reinforces the unavoidable conclusion that the jury likely believed it couldn't consider Grant's evidence as mitigating. That's because, during closing arguments, the prosecution here did exactly what "troubled" the OCCA in Harris : the prosecution used Instruction 12 to "argue that evidence of [Grant's] history, characteristics [and] propensities should not be considered as mitigating simply because" that evidence didn't "go to his moral culpability or extenuate his guilt." 164 P.3d at 1114.
Grant produced two categories of mitigating evidence during the sentencing phase. First, he proffered significant evidence showing that he was schizophrenic. Second, he offered testimony from family members establishing that he experienced an abhorrent childhood that was riddled with parental drug abuse, extreme poverty, and violence. In its closing argument-in-chief during Grant's penalty phase, the prosecution focused on attacking the sufficiency of the evidence that Grant offered. In other words, the prosecution tried to convince the jury that Grant wasn't actually schizophrenic and that his childhood wasn't that bad. Grant doesn't dispute that this was appropriate; nor do I. The jury isn't required to believe all the testimony it hears, and the prosecution is free to implore it not to.
Then, during Grant's closing arguments, his attorneys asked for the jury's sympathy. They were frank about the fact that none of the mitigating evidence Grant presented would actually reduce his moral culpability or guilt. As one of Grant's attorneys told the jury, "I want to be clear that none of the mitigating evidence that we ... will ask you to consider excuses ... what happened in this case. And we *964 understand that and we don't ask you to excuse what happened in this case. It's an explanation." R., vol. 4, Trial Tr. 8, at 44. Both of Grant's attorneys repeated this theme throughout their closing arguments. For example, one attorney explained, "We didn't get up in [the guilt] stage and try to tell you ... Grant is not guilty because he is schizophrenic, but it is an explanation. It's a reason that he ended up where he ended up." Id. at 53. Then, after reviewing the evidence of Grant's terrible upbringing, Grant's attorney again explained, "I'm not t[r]ying to say that it's okay that [Grant] committed a crime because he had tough environments, I'm just trying to explain to you how ... Grant got to this point in his life." Id. at 58.
Then Grant's other attorney took over. She began discussing Grant's life and then told the jury,
I'm going to stop in the story here and talk about that idea of fault for a minute because what we're talking about doesn't have to do with fault .... So don't let [the prosecution] tell you or don't presume on your own that we're telling you that ... Grant's life is an excuse for what he did. It is not an excuse for what he did. We're not saying that. It never will be an excuse. What it is is appropriate information to consider in determining punishment.
Id. at 64-65 (emphasis added). The defense's theme is clear and reasonable. Grant's attorneys recognized that he committed a horrible crime. And they recognized that neither his mental illness nor his childhood reduced his culpability or his blame. But these are undisputedly relevant mitigating factors, so the defense urged the jury to consider them and show Grant mercy.
Given the defense's theme, I question whether the jury would have read Instruction 12-even in isolation-as "provid[ing] a vehicle for the jury to give mitigating effect to" Grant's evidence. Penry I , 492 U.S. at 324, 109 S.Ct. 2934. That's because Instruction 12 defined mitigating circumstances as "those which, in fairness, sympathy, and mercy, may extenuate or reduce the degree of moral culpability or blame." O.R. 2349. And in light of the defense's repeated concessions that Grant's mental illness and childhood did neither, it's difficult to see how the jury could have read Instruction 12 as allowing it to consider this evidence as mitigating.
But even if some jurors might have read Instruction 12 in isolation to allow the jury to consider evidence that didn't reduce Grant's culpability or blame, the prosecution's rebuttal arguments made it nearly certain that the jurors would conclude they couldn't do so.
For instance, shortly into her rebuttal, the prosecutor picked up where Grant's attorneys left off and told the jury the following:
You know, what I noted about the argument of defense counsel is they spent a long time trying to describe to you how what they have offered in mitigation is not an excuse, how what they're trying to tell you about the life and times of ... Grant is not an excuse for the behavior that he committed at the La Quinta Inn in July of 2001. And that is exactly what the law says . Because one thing that I noticed that they did not talk about in their closing argument is what the definition of a mitigating circumstance is. Because the law tells you what that means . It tells you that in order-first of all, you have two choices: Do you believe that the mitigating circumstance has been proven because you don't have to believe everything that you have heard from the witnesses who testified. You can choose what parts you want to believe and disregard those *965 parts that you believe perhaps people were exaggerating about or somehow t[r]ying to make things sound a whole lot worse than they actually were. But let's assume for the sake of argument that everything that you were told was correct, that not any person made up or fudged a little bit in what they were telling you about. What does it say mitigating circumstances are? What does that mean when we say that something may mitigate the murder of these two women, the lives that he took? It says that mitigating circumstances are those which reduce the moral culpability or blame of the defendant . That those things, in order to be mitigating, must reduce his moral culpability or blame.
R. Vol. 4, Trial Tr. 8, at 73-74 (emphases added).
At this point, the defense objected, the parties conferred at the bench, and the trial court overruled the objection. Then the prosecutor continued:
It's not Sandra Elliott [the prosecutor] telling you that this will make something mitigating, that's what the law says . And we all talked about during voir dire that we would be discussing the law that the [c]ourt's going to be giving you. And the law says, not Sandra Elliott, not what the defense attorneys say, but what the [c]ourt tells you and what the law says is that before something can be mitigating it must reduce the moral culpability or blame of the defendant.
Id. at 75 (emphases added).
Finally, after discussing the specifics of the evidence Grant presented, the prosecutor repeated, "So while [the defense] may say to you that [they are] not offering this as an excuse for ... Grant's behavior, you have to look at whether or not it reduces his moral culpability or blame. That is what the law says that you must do ." Id. at 79 (emphasis added).
The prosecutor thus made clear that the jurors could fully exercise their discretion to decide whether, as a factual matter, Grant's evidence proved the circumstances he asserted as mitigating. But she told them that they couldn't stop there. Instead, they then had to decide whether the factors that Grant proved reduced his culpability or blame. If not, the prosecutor explained, the law prohibited the jurors from considering those factors as mitigating.
Using mandatory language like "must," the prosecutor's comments improperly conveyed to the jury that each factor Grant asserted as mitigating had to impact moral culpability or blame to be a mitigating factor. Id. at 75; accord id. at 79. And even more problematically, she added clear qualifying language indicating that this was a prerequisite to ultimately considering a factor as mitigating at all. See id. ("[B ]efore something can be mitigating it must reduce the moral culpability or blame of the defendant." (emphasis added)). With these comments, the prosecutor explicitly tethered the legal definition of "mitigating circumstance" to a circumstance that reduced Grant's moral culpability or blame. And she repeatedly and explicitly made clear that this wasn't just her own guidance to the jury; it was what "the law" compelled. Id. at 75; accord id. at 73; id. at 79.
Put differently, my objection is that the prosecution used an ambiguous jury instruction to inject an additional, unconstitutional step into the mitigation analysis. Normally, the jury should undertake a two-step process. First, it should consider whether the evidence actually supports the defendant's asserted mitigating factor. Cf. Eddings , 455 U.S. at 113, 102 S.Ct. 869 (explaining that sentencer may "evaluate the evidence in mitigation and find it wanting as a matter of fact"). Next, it *966 should consider what weight to afford that mitigating factor when balanced against the aggravating factors. Cf. id. at 114-15, 102 S.Ct. 869 ("The sentencer ... may determine the weight to be given relevant mitigating evidence ...."). But the prosecution's comments here suggest an intermediate step: if the jury determines that the evidence supports the asserted mitigating factor, then it must also determine whether that factor is actually mitigating-that is, whether it "reduce[s] the moral culpability or blame of the defendant." R. vol. 4, Trial Tr. 8, at 75. If so, then-and only then-can the jury reach the final step of the inquiry and determine what weight to afford the mitigating factor.
The result is the precise scheme that the Court rejected in Eddings . In that case, the sentencing judge concluded that " 'in following the law,' he could not 'consider the fact of [the defendant]'s violent background.' " Eddings , 455 U.S. at 112-13, 102 S.Ct. 869 (citation omitted). The judge's error, the Supreme Court later explained, was not that he "evaluate[d] the evidence in mitigation and [found] it wanting as a matter of fact; rather he found that as a matter of law he was unable even to consider the evidence." Id. at 113, 102 S.Ct. 869. This is precisely what the prosecution told the jury it must do here: if the jury did not believe the evidence reduced Grant's culpability or blame, then the "the law sa[id]" the jury could not find the evidence to be mitigating. R. Vol. 4, Trial Tr. 8, at 75.
The majority disagrees. In doing so, it relies heavily on comparisons to Hanson , 797 F.3d 810. But the error here is materially-albeit subtly-different from the error asserted in that case.
We've explained that the prosecution may "comment[ ] on the weight that should be accorded to the mitigating factors" but may not "suggest that the jury [is] not permitted to consider the factors." Fox v. Ward , 200 F.3d 1286, 1300 (10th Cir. 2000) ; see also Eddings , 455 U.S. at 114-15, 102 S.Ct. 869 ("The sentencer, and the Court of Criminal Appeals on review, may determine the weight to be given relevant mitigating evidence. But they may not give it no weight by excluding such evidence from their consideration."). In Hanson , the prosecution did the former. It encouraged "the jury to consider whether any of the mitigating circumstances 'really extenuate[d] or reduce[d] [the defendant's] degree of culpability or blame in this case.' " 797 F.3d at 851 (citation omitted). And it said, "Consider all the mitigating circumstances and you'll consider what weight [to give them]." Id. at 852 (alteration in original) (citation omitted). But it doesn't appear that the prosecution in Hanson suggested-as the prosecutor did here-that, "as a matter of law ," the jury couldn't conclude the evidence was mitigating if it didn't reduce the defendant's culpability or blame. Eddings , 455 U.S. at 113, 102 S.Ct. 869. Thus, while the prosecution in Hanson permissibly "commented on the weight" that the jury should accord the mitigating factors, the prosecution here impermissibly asserted "that the jury was not permitted to consider [Grant's] factors." Fox , 200 F.3d at 1300.
II. Grounds for Habeas Relief
It's thus abundantly clear that the prosecutor's comments here were "an egregious misstatement of the law on mitigating evidence." Harris , 164 P.3d at 1114. And the majority doesn't seriously dispute this. See Maj. Op. 938 ("To be sure, we acknowledge that a plausible argument could be made here that the prosecutor's rebuttal arguments were 'improper'-that is, one could plausibly contend that those remarks resemble the kind of 'misuse' of *967 the moral-culpability text that concerned the OCCA in Harris ." (quoting Harris , 164 P.3d at 1114 )). Rather, the majority questions the effect of the prosecution's "improper" misstatements on the jury. Id. (quoting Harris , 164 P.3d at 1114 ). And it concludes that the OCCA could have reasonably decided that there is no reasonable likelihood the jury would have credited those misstatements.
The majority errs in two respects. First, the OCCA didn't address this argument "on the merits," 28 U.S.C. § 2254(d), so AEDPA's deferential standard of review doesn't apply. And second, it beggars belief to conclude that there's no reasonable likelihood the jury followed the prosecution's commands. So even if the OCCA reached this conclusion, it did so unreasonably.
A. Proper Standard of Review
1. Grant's Failure to Argue for De Novo Review
Preliminarily, the majority concludes that we must defer to the OCCA because Grant doesn't argue for de novo review. But "the correct standard of review under AEDPA is not waivable." Gardner v. Galetka , 568 F.3d 862, 879 (10th Cir. 2009). And despite the majority's assertion to the contrary, we made clear in Gardner that this principle applies to both habeas petitioners and respondents: our discussion in that case broadly (and repeatedly) referred to the "parties." Id. ("Other courts of appeal ... all have concluded that the standard of review under AEDPA cannot be waived by the parties ." (emphasis added)); accord id. ("It is one thing to allow parties to forfeit claims, defenses, or lines of argument; it would be quite another to allow parties to stipulate or bind us to application of an incorrect legal standard, contrary to the congressional purpose." (emphases added)). Moreover, as support for our decision, we relied on a Sixth Circuit case specifically holding that a habeas petitioner can't waive de novo review of an exhausted claim that the state court didn't adjudicate on the merits. See id. (citing Brown v. Smith , 551 F.3d 424, 428 n.2 (6th Cir. 2008) ); Brown , 551 F.3d at 428-30, 428 n.2.
Despite Gardner 's broad language, the majority suggests it doesn't apply to the specific facts before us here. According to the majority, congressional interests in federalism, comity, and finality require us to defer to the state court regardless of whether the state argues we should. But those same concerns, the majority indicates, forbid us from reviewing the state court de novo unless the petitioner argues we should.
For several reasons, I find the majority's attempts to distinguish Gardner unavailing. First, Gardner simply applies to the habeas context the more general rule "that 'the court, not the parties, must determine the standard of review, and therefore, it cannot be waived.' " United States v. Fonseca , 744 F.3d 674, 682 (10th Cir. 2014) (quoting Worth v. Tyer , 276 F.3d 249, 262 n.4 (7th Cir. 2001) ). Thus, although federalism, comity, and finality might provide additional reasons why we shouldn't let the state waive deferential review under AEDPA, Gardner doesn't in any way suggest we would depart from Fonseca 's more general rule in the habeas context absent these additional policy considerations.
Second, the majority doesn't explain how we would offend principles of federalism or comity by reviewing de novo an argument that the OCCA didn't address on the merits, even if the petitioner hasn't asked us to apply that less deferential standard of review. Federalism and comity require us-within reason-to respect how a state court chooses to resolve an issue. See *968 § 2254(d) ; Woodford v. Garceau , 538 U.S. 202, 206, 123 S.Ct. 1398, 155 L.Ed.2d 363 (2003). But this concern simply isn't implicated when the state court doesn't resolve that issue on the merits. Thus, there's no reason federalism or comity should reenter the equation just because a petitioner fails to argue for de novo review.
Third, as much as AEDPA seeks to protect federalism and comity, it also seeks to ensure that defendants aren't convicted or sentenced in violation of federal law. See Murdoch v. Castro , 609 F.3d 983, 1001 (9th Cir. 2010) (Kozinski, J., dissenting) (explaining that deferring to state-court decision that doesn't resolve particular federal claim "upsets the 'delicate balance' struck by AEDPA between vindicating the rights of criminal defendants and upholding the authority of state courts as the primary forum for adjudicating these rights" (quoting Williams v. Taylor , 529 U.S. 420, 436, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000) )). Thus, although AEDPA cautions us to respect a state court's decision, it also requires that at least one court-state or federal-hears the defendant's exhausted claims. See id. (noting that although state court has "primary responsibility" to adjudicate federal habeas claims, federal court must adjudicate those claims on merits if state court forgoes this responsibility). In short, if federalism and comity require us to defer to a state court's decision regardless of whether the state asks us to, then AEDPA's interest in the protection of federal rights likewise requires us to grant de novo review of claims not addressed on the merits regardless of whether the petitioner asks us to.
Finally, the case that the majority relies on- Eizember v. Trammell , 803 F.3d 1129 (10th Cir. 2015) -doesn't establish otherwise. In Eizember , we concluded that a habeas petitioner waived an argument that he could overcome AEDPA deference; we did not, as the majority asserts here, "rebuff[ ]" an "effort by the dissent" in that case to establish that AEDPA deference didn't apply at all. Maj. Op. 931 n.20; see also Eizember , 803 F.3d at 1140-41. That is, the dissent in Eizember never suggested, as I do here, that the state court failed to adjudicate the petitioner's claim on the merits, thus triggering de novo review. See Eizember , 803 F.3d at 1160-61 (Briscoe, J., concurring in part and dissenting in part). And this distinction explains why we didn't acknowledge Gardner in Eizember , let alone suggest that we were overruling it or our more general rule that parties can't waive the appropriate standard of review. See id. at 1140-41 (majority opinion). Nor would we have had any reason to do so. Gardner explicitly left open the path the majority followed in Eizember : it distinguished between "lines of [substantive] argument" (which are subject to traditional principles of waiver and forfeiture) and AEDPA's standard of review (which is not). Gardner , 568 F.3d at 879. Eizember concerned only the former. In reaching a different conclusion about the latter, the majority here charts new ground.
2. The OCCA's Misunderstanding of Grant's Argument
In arguing to the OCCA on direct appeal that the state improperly precluded the jury from considering his mitigating evidence, Grant framed his argument more or less as I do above. The state's key error, he explained, was that it "argued to the jury not to even consider his proffered evidence as mitigating under the law given to them." Aplt. Br. at 79, Grant v. State , 205 P.3d 1 (Okla. Crim. App. 2009). Thus, he posited, "[t]hough none of [Grant's] ten mitigating circumstances excused his crime or reduced his moral or legal culpability or blame, they may have given a reasonable juror a reason to exercise sympathy and mercy upon ... Grant and *969 spare his life." Id. But, "in light of the prosecutor's persistent emphasis upon what 'the law sa[id],' [Grant's] jury could not ... give effect to ... Grant's mitigating [factors]." Id. (citation omitted).
The OCCA misunderstood this argument as merely "claim[ing] the prosecutor misstated the law by telling the jurors that the evidence [Grant] had presented as 'mitigating' did nothing to justify a sentence less than death." Grant , 205 P.3d at 21. It then rejected this argument, explaining, "While there is no restriction whatsoever on what information might be considered mitigating, no juror is bound to accept it as such, and the State is free to try to persuade the jury to that end." Id.
The majority accepts this faulty characterization of Grant's argument. See Maj. Op. 930-31-. But a look to Grant's briefing on direct appeal reveals that Grant never asserted that the state erred by arguing the mitigating evidence did nothing to justify a sentence less than death. Instead, Grant quite clearly argued the state improperly told the jury that unless his evidence reduced his culpability or blame, then the evidence, as a matter of law, wasn't mitigating even if the jury thought it might justify a sentence less than death.[3]
I won't build on this strawman. And I certainly won't defer to it. "[I]f an examination of the opinions of the state courts shows that they misunderstood the nature of a properly exhausted claim and thus failed to adjudicate that claim on the merits, the deferential standards of review in AEDPA do not apply." Chadwick , 312 F.3d at 606 ; see also Campbell v. Bradshaw , 674 F.3d 578, 596 (6th Cir. 2012) (reviewing habeas claim de novo because "[i]t appear[ed] that, when considering the trial court's ruling, the Ohio Supreme Court misconstrued [the defendant's] argument"); DeBerry v. Portuondo , 403 F.3d 57, 71-72 (2d Cir. 2005) (explaining that "habeas claims may be reviewed without AEDPA deference" when "a properly preserved claim, recognized as such, was misconstrued by the state court and hence not decided 'on the merits' " (quoting *970 § 2254(d) ); Davis v. Sec'y for Dep't of Corr. , 341 F.3d 1310, 1313 (11th Cir. 2003) (explaining that "controversy [fell] outside of § 2254(d)(1)'s [deference] requirement" because state court misconstrued defendant's claim and thus "failed to resolve [it]" on the merits); Henderson v. Cockrell , 333 F.3d 592, 600-601 (5th Cir. 2003) (holding that "AEDPA's standards of review [were] inapplicable" because state court misconstrued defendant's claim).
Our inquiry should thus begin and end by asking "whether there is a reasonable likelihood that the jury ... applied [Instruction 12] in a way that prevent[ed] the consideration of constitutionally relevant evidence." Boyde , 494 U.S. at 380, 110 S.Ct. 1190. In light of the prosecution's insistence that the jury not consider Grant's mitigating evidence, the answer to this question is an easy "yes." Thus, applying de novo review, I would reverse the district court's order denying Grant's habeas petition.
B. The Other Instructions and Comments
Alternatively, I would reverse under § 2254(d)'s deferential standard of review because the OCCA would have been unreasonable to reject this claim on the merits, had it hypothetically done so. The majority says that portions of the other jury instructions and the prosecution's closing argument-in-chief could have reasonably led the OCCA to "conclude[e] that there was no reasonable likelihood that the jury was precluded by the prosecution's closing arguments from considering all of ... Grant's mitigation evidence-including the evidence that did not extenuate or reduce his moral culpability or blame." Maj. Op. 945. I agree that the other jury instructions and the remainder of the prosecution's closing argument are relevant considerations. See Hanson , 797 F.3d at 851-52. But I can't agree that either has ameliorative power here.
Before I address the majority's specific arguments, I pause to clarify the standard that the majority applies when it defers to the OCCA. Following § 2254(d)(1), the majority asks whether the OCCA unreasonably applied clearly established Supreme Court law-i.e., Lockett and its progeny. And recall that the Boyde inquiry is "whether there is a reasonable likelihood that the jury ... applied the challenged instruction in a way that prevent[ed] the consideration of constitutionally relevant evidence." 494 U.S. at 380, 110 S.Ct. 1190. Combining these standards, we ask whether the OCCA reasonably concluded that there is no "reasonable likelihood that the jury ... applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." Id.
It's important not to lose sight of what this inquiry involves. We don't ask whether the OCCA could have reasonably concluded that the jury might have known it could consider all of Grant's mitigating evidence. I agree that the OCCA could have reasonably reached such a conclusion. But I cannot agree that the OCCA could have reasonably concluded that it's unlikely that even a single juror felt precluded from considering Grant's evidence. And this is the applicable standard. See id.
1. Suggestions that the Jury Could Decide Whether the Evidence was Mitigating
The majority makes much of the fact that both the jury instructions and the prosecution emphasized that the jury could ultimately decide if Grant's evidence was actually mitigating. But this wouldn't have corrected a juror's misunderstanding of what "mitigating" means. That's because the jury received an erroneous definition of "mitigating." Thus, simply reminding *971 the jury that it could decide whether the evidence met that definition didn't cure the error.
Accordingly, the portion of Instruction 12 telling the jury that "[t]he determination of what circumstances [were] mitigating [was] for [the jury] to resolve under the facts and circumstances in this case," gave Grant no relief from the prosecution's erroneous definition of "mitigating." Nor did the portion of Instruction 13 that told the jury that it could "decide that other mitigating circumstances exist[ed]." O.R. 2351. And this is also true for the prosecution's comments that whether a fact is mitigating was "for [the jury] to consider," R. vol. 4, Trial Tr. 8, at 31, and that it was "up to [the jury] to determine whether or not these mitigators-whether or not these circumstances somehow mitigate[d] what ... Grant did," id. at 32.
The majority is quick to point out that in Hanson we concluded that the same instructions and similar statements during closing argument alleviated the asserted error. But as I explain above, this case isn't Hanson . The prosecution in Hanson didn't give the jury an erroneous definition of "mitigating." See 797 F.3d at 851-52. The prosecution in that case certainly urged the jury not to give the defendant's evidence any mitigating weight unless it reduced the defendant's culpability or blame. See id. at 851. But-unlike the prosecutor in this case-the prosecution in Hanson didn't tell the jury that the law precluded it from doing so. Thus, in the absence of such of a misstatement from the prosecutor, the OCCA could have reasonably concluded in Hanson that the jury read the phrase "[t]he determination of what circumstances are mitigating is for you to resolve," O.R. 2349, to mean that the jury had discretion to consider anything to be mitigating. But these instructions have no similar effect here, where the prosecutor instead urged the jurors not to consider Grant's evidence as mitigating at all. Cf. Eddings , 455 U.S. at 115, 102 S.Ct. 869 (explaining that capital sentencer may not "give [defendant's mitigating evidence] no weight by excluding such evidence from [its] consideration").
2. Instruction 13's List of Mitigating Evidence
I do recognize that other parts of Instruction 13 may have led some jurors to correctly infer that they could consider all of Grant's mitigating evidence. For instance, Instruction 13 stated, "Evidence has been introduced as to the following mitigating circumstances," and then provided a summary of the various evidence that Grant introduced. O.R. 2350. Certainly a juror might have inferred from this list that the jury could legally consider these factors as mitigating even if it concluded that the factors didn't reduce Grant's moral culpability or blame. But Boyde doesn't require us to be certain that the jury felt it couldn't consider a relevant mitigating factor. See 494 U.S. at 380, 110 S.Ct. 1190. Indeed, it doesn't even require the defendant to "establish that the jury was more likely than not to have been impermissibly inhibited." Id. It merely requires a "reasonable likelihood." Id.
Even considering Instruction 13, Grant easily meets this burden. Instruction 13 might have led some jurors to disregard Instruction 12 and the prosecutor's statements and apply the proper law. But other jurors might have simply (1) read Instruction 13 as summarizing the evidence that Grant presented and (2) concluded that the jury nevertheless had to decide whether these factors reduced Grant's culpability or blame. At most, Instruction 13 gives skeptical jurors grounds to infer that the prosecutor misstated the law. But nothing about Instruction 13 makes it unlikely that *972 at least one juror would have believed the prosecutor's misstatements.
Further, to the extent that a juror could read Instruction 13 to say that the jury could consider all of Grant's mitigating evidence, regardless of whether it reduced his moral culpability or blame, Instruction 13 conflicts with Instruction 12, which suggests the opposite. And this conflict "inserted 'an element of capriciousness' into the sentencing decision, 'making the jurors' power to avoid the death penalty dependent on their willingness' to elevate [Instruction 13] over [Instruction 12]." Penry v. Johnson(Penry II) , 532 U.S. 782, 800, 121 S.Ct. 1910, 150 L.Ed.2d 9 (2001) (quoting Roberts v. Louisiana , 428 U.S. 325, 335, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976) (plurality opinion)).
3. The Lack of Objection to Grant's Evidence
Finally, the majority speculates that the jury might have attached some significance to the fact that Grant was allowed to present his mitigating evidence at all. Essentially, the majority surmises, the jury might have expected the prosecution to object to Grant's evidence if the evidence was indeed legally irrelevant to the jury's inquiry-and for the trial court to sustain that objection. Ergo, these perceptive jurors would have concluded that the evidence was not legally irrelevant.
I simply can't subscribe to the speculation that all 12 members of a layperson jury engaged in such spontaneous consideration of the rules regarding the admissibility of irrelevant evidence. Frankly, I'm not even sure that 12 lawyers would make this inference. But even if the jury contemplated such an approach, it doesn't necessarily follow that just because the evidence was admissible, the jury would consider it as mitigating regardless of whether it thought the evidence reduced Grant's culpability or blame. Some jurors might have believed that they had leeway to determine that Grant's evidence did reduce his moral culpability or blame (for example, if they concluded that Grant committed the crimes during a schizophrenic delusion). But then, if these jurors decided that the evidence didn't reduce Grant's moral culpability or blame, they wouldn't have considered whether that evidence nevertheless justified sentencing Grant to a sentence less than death, as Lockett and its progeny demand they be allowed to do. See 438 U.S. at 604, 98 S.Ct. 2954. In any event, we need not say for certain what the jury might have thought as long as there's a reasonable likelihood a juror could have been misled. There undoubtedly is here.
C. The Jury's Natural Impression
The dispute here can be boiled down to one question: Is it reasonably likely that at least one juror believed the prosecutor when she purported to tell the jury what "the law sa[id]?" R. vol. 4, Trial Tr. 8, at 75. The only reasonable answer is "yes." We've warned in the past that we must be "especially aware of the imprimatur of legitimacy that a prosecutor's comments may have in the eyes of the jury." Le v. Mullin , 311 F.3d 1002, 1018 (10th Cir. 2002) ; see also Berger v. United States , 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935) (explaining that prosecution's "interest ... in a criminal prosecution is not that it shall win a case, but that justice shall be done"; noting that "the average jury ... has confidence that these obligations ... will be faithfully observed"; and concluding that prosecution's "improper suggestions" are therefore "apt to carry much weight against the accused").
And we cannot ignore that the trial court overruled Grant's objection when the prosecutor said that Grant's evidence, "in *973 order to be mitigating," had to "reduce his moral culpability or blame." Id. at 74, 55 S.Ct. 629. Far from it, we've explained that when a trial court overrules defense counsel's objections in a case like this, "[t]he official imprimatur thereby placed upon the prosecution's misstatements of law obviously amplifie[s] their potential prejudicial effect on the jury." Mahorney v. Wallman , 917 F.2d 469, 473 (10th Cir. 1990).
In sum, the jury had no reason to doubt the prosecutor when she said, "[T]he law tells you ... that mitigating circumstances are those which reduce the moral culpability or blame of the defendant." R. vol. 4, Trial Tr. 8, at 73-74. It had no reason to doubt her when she said, "[Grant's evidence] in order to be mitigating, must reduce his moral culpability or blame." Id. at 74. It had no reason to doubt her when she said, "[What] the law says, not Sandra Elliott [the prosecutor], not what the defense attorneys say, but what the [c]ourt tells you and what the law says is that before something can be mitigating it must reduce the moral culpability or blame of the defendant." Id. at 75. And it had no reason to doubt her when she said, "[Y]ou have to look at whether or not it reduces his moral culpability or blame. That is what the law says that you must do." Id. at 79.
On the contrary, all three sources that the jury would have looked to for an accurate statement of the law-Instruction 12, the prosecution, and the trial court itself-gave the jury good reason to believe that it couldn't consider Grant's mitigating evidence if that evidence didn't reduce Grant's culpability or blame, as the defense conceded it didn't. The only thing that would have led the jurors to believe otherwise is an inference that they could have made from Instruction 13. It's thus clear that "[i]n light of the prosecutor's argument, and in the absence of appropriate jury instructions, a reasonable juror could well have believed that there was no vehicle for expressing the view that [Grant] did not deserve to be sentenced to death based upon his mitigating evidence." Penry I , 492 U.S. at 326, 109 S.Ct. 2934. And to the extent that the OCCA concluded otherwise on the merits-and again, I'm confident that it did not-that conclusion was unreasonable.
III. Harmless Error
Because the majority doesn't believe that AEDPA allows us to reach the trial court's error, it has no opportunity to consider whether this error was harmless. I would find that it plainly is not.
An error is only reversible on habeas review if it "had substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson , 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (quoting Kotteakos v. United States , 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946) ). We've elaborated that this means we must grant habeas relief if we find ourselves "in 'grave doubt' about the effect of the error on the jury's verdict." Welch v. Workman , 639 F.3d 980, 992 (10th Cir. 2011) (quoting O'Neal v. McAninch , 513 U.S. 432, 435, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995) ); see also McAninch , 513 U.S. at 435, 115 S.Ct. 992 ("By 'grave doubt' we mean that, in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error.").
I find myself in grave doubt here, especially considering the theme of the defense's closing argument. Essentially, the defense (1) admitted to the jury that the factors it asserted as mitigating didn't reduce Grant's culpability or blame but (2) argued those factors nevertheless warranted the jury's sympathy. For the prosecution *974 to rebut this by telling the jury it couldn't actually consider the evidence as mitigating unless it reduced Grant's culpability or blame gutted the defense's argument and left the jury with no room to decide whether the factors that Grant identified as mitigating-and the powerful evidence he offered to prove those factors-warranted a sentence other than death. Because wholly denying Grant his opportunity to present his case in mitigation had a substantial and injurious effect on the jury's determination that the death penalty was warranted in this case, the error wasn't harmless under Brecht .
* * *
Grant's crimes were abhorrent. But even the worst offenders have an absolute right to ask for mercy. It is disturbingly clear to me that Grant never had that opportunity. I would not allow Grant's execution to proceed without giving Grant an opportunity to explain to a jury why he doesn't deserve to die. I would thus reverse the district court's order denying Grant's habeas petition.

Instruction 12 stated, "Mitigating circumstances are those which, in fairness, sympathy, and mercy, may extenuate or reduce the degree of moral culpability or blame." O.R. 2349.

Relying on Mills v. Maryland , 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), Grant argues that the OCCA's decision to amend Instruction 12 in Harris is strong evidence that Instruction 12 is unconstitutional. In Mills , the Court reversed a defendant's death sentence because it concluded that Maryland's jury instructions might have led some jurors to believe that they were compelled to vote for death if the jury failed to unanimously agree on the existence of any particular mitigating factor. Id. at 384, 108 S.Ct. 1860. As the OCCA did in Harris , 164 P.3d at 1113-14, the Maryland Court of Appeals rejected the defendant's argument but then changed the uniform instruction. Id. at 371-73, 381-83, 108 S.Ct. 1860. The Supreme Court took this into account when it concluded that the former instructions were impermissibly misleading, explaining that the Court "infer[red] from these changes at least some concern on the part of [the Maryland Court of Appeals] that juries could misunderstand the previous instructions as to unanimity and the consideration of mitigating evidence by individual jurors." Id. at 383, 108 S.Ct. 1860.
Grant argues that we should take a similar approach here and view Harris as evidence that Instruction 12 is impermissibly misleading. But, as Grant acknowledges, we declined to use Harris as grounds to find Instruction 12 unconstitutional in Hanson , 797 F.3d at 850-51. He nevertheless advances this argument to preserve it for further review.
Although I recognize that this panel can't overturn Hanson , I question whether we overlooked there the extent of the similarity between Mills and Harris . In Hanson , we explained that Harris didn't inform our inquiry because in Harris , "the OCCA 'emphasize[d] that the language of [Instruction 12] itself [was] not legally inaccurate, inadequate, or unconstitutional.' " Hanson , 797 F.3d at 850-51 (first alteration in original) (quoting Harris , 164 P.3d at 1114 ). But the Maryland Court of Appeals in Mills likewise expressed contentment with its instruction. See Mills v. State , 310 Md. 33, 527 A.2d 3, 15 (1987) (concluding "there [was] no ambiguity in the language of [the instruction] concerning unanimity"), rev'd by Mills , 486 U.S. at 384, 108 S.Ct. 1860. So I see little difference between the Maryland Court of Appeals' decision to change its jury instruction and the OCCA's decision to change Instruction 12.

The majority's framing of the OCCA's reasoning certainly better aligns with the claim that Grant actually asserted. The majority says the OCCA concluded that "it was not reasonably likely that the jury read the [prosecution's] comments as doing anything more than vigorously-but permissibly-attacking the veracity, credibility, and weight of ... Grant's mitigating evidence .... Indeed, in essence, this is precisely what the OCCA held." Maj. Op. 938-39 (internal citations omitted). But the OCCA-in the two paragraphs it devoted to this issue on direct appeal-said nothing whatsoever about how the jury might have interpreted the prosecutor's comments. See Grant 205 P.3d at 20-21. I realize that AEDPA is highly deferential, but nothing in AEDPA or our case law authorizes us to retroactively correct a state court's fundamental misunderstanding of "the nature of a properly exhausted claim." Chadwick , 312 F.3d at 606.
The majority insists that "the precise nature of ... Grant's claim was crystal clear to the OCCA." Maj. Op. 936 n.22. Yet the majority doesn't dispute my conclusion that the OCCA misconstrued Grant's argument when it said, "[Grant] claims the prosecutor misstated the law by telling the jurors that the evidence he had presented as 'mitigating' did nothing to justify a sentence less than death." Grant , 205 P.3d at 21. Instead, the majority points to other language introducing the issue that it reads as more properly paraphrasing Grant's argument. But regardless of how the OCCA might have initially framed Grant's argument, the OCCA's actual analysis shows that it never addressed that argument. That is, the OCCA didn't address whether the jury likely felt precluded, as a matter of law, from considering Grant's evidence. Instead, it only addressed whether "the [s]tate [was] free to try to persuade the jury" that it wasn't "bound to accept" Grant's mitigating evidence as "successfully serv[ing] its intended purpose." Id. This is not what Grant argued.